**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**DONALD BOWENS,**

                                  **Plaintiff,**

            **-v-**                                                    **06-CV-0457A(Sr)**

**M.E. POLLOCK, et al.,**

                                  **Defendants.**

---

## REPORT, RECOMMENDATION AND ORDER

            This case was referred to the undersigned by the Hon. Richard J. Arcara,

pursuant to Title 28, United States Code, Section 636(b)(1), for all pretrial matters and

to hear and report upon dispositive motions.  Dkt. #19.


            Plaintiff, proceeding *pro se*, commenced this action pursuant to Title 42,

United States Code, Sections 1981, 1983, 1985 and 1986, alleging that defendants

engaged in a conspiracy and violated his constitutional rights to free speech, access to

the courts, equal protection and due process and subjected him to cruel and unusual

punishment in retaliation for the performance of his duties as Secretary of the

Groveland Correctional Facility ("Groveland"), Inmate Liaison Committee ("ILC"), during

his incarceration at that facility.  Dkt. #1.


            Currently before the Court are defendants' motions for summary judgment

(Dkt. ##31 and 51), and plaintiff's motion for summary judgment.  Dkt. #45.  For the

following reasons, it is recommended that defendants' motions be granted in part and denied in part and that plaintiff's motion be denied in its entirety.

## **BACKGROUND**

Plaintiff arrived at Groveland in January 2004.  Dkt. #1, ¶ 23.  Plaintiff signed a client participation contract for the Veterans Residential Therapeutic Program ("Veterans Program"), on April 8, 2004, and subsequently completed both the basic and after care portions of that program.  Dkt. #26, p.106.  The Veterans Program Conduct Guide provides, *inter alia*:

> Be reminded that **NO** pornographic materials, or gambling are allowed as a participant of this Program, or dorm resident.

Dkt. #26, p.104.

Following completion of the Veterans Program, plaintiff continued as a Clerk in the Veterans Program and remained in the Veterans Program Housing Unit.  Dkt. #1, ¶ 23.  Plaintiff chose to volunteer as a Clerk so that he could keep his higher paying position as a Clerk in the Law Library, but understood that he would have the option of dropping his position in the Law Library should it become necessary for him to be paid as a Clerk in order to remain in the Veterans Program Housing Unit.  Dkt. #1, ¶ 24.

In February 2005, plaintiff was elected as the Veterans Program Representative to the ILC and in July 2005, he was elected Secretary of the ILC.  Dkt. #1, ¶ 25.  In October 2005, the Chair of the ILC, inmate McDuffy, instructed plaintiff to

speak to Sergeant Pollock, the ILC Staff Advisor, regarding the movie selection for November.  Dkt. #1, ¶ 26.  When he was unable to locate Sergeant Pollock on October 13th and 14th, plaintiff typed two letters and placed them both under Sergeant Pollock's door, expecting that Sergeant Pollock would forward the second letter to Deputy Superintendent Bartlett.  Dkt. #26, p.51.  Plaintiff states that he did not send copies of these letters to anyone else.  Dkt. #26, p.52.

        The first letter requested that Sergeant Pollock "let the movie selection that was voted on by the inmate population and submitted for November, go unchanged."  Dkt. #1-2, p.9.  The second letter was addressed to Deputy Superintendent Bartlett and advised that:

> It has come to the attention of the I.L.C. that D.O.C.S. has approved all movies that are listed in the Swank Catalog for all Correctional Facilities throughout the State of New York.
>
> At this time the I.L.C. is respectfully requesting that they be provided with a Swank Movie Catalog.  A Swank Catalog will increase the Population's viewing selection and assure that the selection[s] are in compliance with D.O.C.S., and Media review.  Also, the I.L.C. is respectfully requesting that they be provided with a catalog of the movies that are available from the Dansville Block Buster Video Store.
>
> Thank you for your time in this matter, and may we please hear from you soon.

Dkt. #1-2, p.10.

        Sergeant Pollock explained that,

> [o]n 10/18/05, I found two letters, on I.L.C. letterhead, that had been shoved underneath my office door in the Peterson Building.  I reviewed the letters; one was a letter to me requesting that I rescind my decision to change the

November movies that had been voted on by population. The second was a letter to DSP Bartlett requesting movie catalogs from two vendors. Both letters were photocopies and there was no cover letter. Inmate Bowens signed both. Bowens is the Secretary for the Inmate Liaison Committee.

I had Inmate Liaison Committee Chairman M. McDuffie[1] . . . report to my office so I could ask what the memos were about. Inmate McDuffie had knowledge of the situation, but denied giving Inmate Bowens permission to send any letters. McDuffie stated that he delegated Bowens to talk to me, but not put anything in writing. There is a standing order from me that no letter from the I.L.C. can be sent out unless signed by the Chair or Vice-Chair. Further, I must review the letter and sign off first before it goes beyond the I.L.C. It appeared that the letters from Bowens were in violation of these orders. McDuffie asked if I could call Bowens to my office for further information.

When Inmate Bowens reported to my office, I asked him to sit down. Inmate McDuffie was still present. I asked what the memos were all about. I explained that I did not change the November listings, nor do I ever see the list. D. Petric, Senior Librarian, supervises the Movie program with permission from D.S.P. Bartlett. I also asked when was there ever a vote taken by population over the monthly movies. I asked how many inmates voted, where did they vote, etc? I do admit being assertive, but not hostile or irate. Inmate Bowens admitted that there had not been a vote. Just some inmates came up to him in the yard and suggested some films.

In regard to the memo to DSP Bartlett, Inmate Bowens then stated he had not yet sent it to her. I asked whether he had spoken to Mr. Petric about the movie catalogs and he admitted he had not. He could offer no explanation for not going through the chain of command. He stated he would give all copies of both memos to ILC Chair McDuffie. Both inmates were then sent on their way.

---

[1] The record in unclear whether the correct spelling of Inmate Liaison Committee Chairman's last name is McDuffie or McDuffy. Accordingly, it appears in this Report, Recommendation and Order as it appears in the documents in the record, either McDuffie or McDuffy.

Dkt. #26, p.124. Sergeant Pollock further explained that he

> did take [the] memo issued by Bowens very seriously
> because it was a breach of protocol and additionally placed
> my creditability [sic] with the Inmate population at risk. As
> the Inmate Liaison Committee Staff Advisor, my creditability
> [sic] is what allows me to do my job effectively.

Dkt. #26, p.137.

> On October 19, 2005, Sergeant Pollock explained that he was
>
> reviewing my notes and found that Inmate Bowens was
> residing in G-2 Dorm. The entire G-Block is reserved for
> inmates programmed into the V.R.T.P. program or the G-
> Block porters. Inmate Bowens was a full time paid Eve/Late
> Eve Law Library Clerk. Records reflected that he was a
> volunteer clerk for the V.R.T.P. program. I spoke with
> Correction Counselor Strollo and confirmed that Inmate
> Bowens was not active in the Treatment Program. After Mr.
> Strollo and I spoke about the incident, he stated that there
> was no need for Inmate Bowens to reside in the block. I
> notified Captains' Office of my findings and they ordered him
> to be moved to another dorm to allow another inmate to
> begin the Treatment program. As a sergeant, I do not have
> the authority to make such a move on my own.

Dkt. #26, p.135. Captain Wilcox authorized plaintiff's move after Sergeant Pollock

brought to his attention the fact that plaintiff was a volunteer clerk, explaining to plaintiff

during the course of his Tier III hearing that it was his policy for inmates to be housed

where they are programmed, and noting that,

> [a]ccording to Mr. Strollo you were not on the payroll but you
> were a volunteer. Now if you're a volunteer and [you are
> taking] bed space from an inmate that is supposed to be
> programmed there, I will move you . . .

Dkt. #26, pp.12 and 14.

In response to plaintiff's grievance concerning his removal from the

Veterans Program Housing Unit, Inmate Grievance Program Supervisor O'Brien

responded that Captain Wilcox advised that,

> the Veteran's dorm is for those actively participating in the
> Veteran's Program.  Facility records confirm that the grievant
> completed his active participation in the program on 10/2/05.
> It is not the policy of this facility to house inmates based
> upon their choice of volunteer service.  The grievant was
> properly moved at the discretion of security for facility needs.
> The space in the Veteran's dorm is correctly given to those
> actively in the program, for which a waiting list exists.

Dkt. #26, pp.156-158.  Plaintiff complains that he was removed from a therapeutic

housing environment of 34 inmates "to one of the most incident prone dorms in the

facility" housing 60 inmates and that he was "moved from a single man cube to the top

bunk in a double bunk area."  Dkt. #1, ¶ 53.

At approximately noon on October 19, 2005, Sergeant Pollock authored a

misbehavior report charging plaintiff with a violation of Rule 113.15 (Contraband –

Inmates shall not purchase, sell, loan, give, or exchange personally owned articles

without authorization); Rule 113.22 (Contraband – Inmates shall not use or possess

authorized articles in unauthorized areas); Rule 113.23 (Contraband – Inmates shall not

be in possession of any article that is not authorized by the Superintendent or

designee); Rule 116.10 (Inmates shall not lose, destroy, steal, misuse, damage or

waste any type of State property); and Rule 180.17 (Unauthorized Legal Assistance).

Dkt. #26, p.5.  Sergeant Pollock described the incident as follows:

> On 10/19/05, C.O. R. Dickerson ordered D. Bowens . . . to
> pack up his personal property to move to K-1.  The inmate
> took the draft bags.  A short time later the officer went to

check on Bowens and could not locate him.  The office[r]
went to the basement V.R.T.P. Clerk's Office where Bowens
was a volunteer clerk.  Officer Dickerson found and checked
a bag and found Bowen's personal legal work and some
state office supplies.  He then secured the office.  A short
time later, he found Inmate Bowens packing in his cube.
The inmate finished and before leaving asked for access to
the basement Clerk's office to get his personal draft bag.  At
that point the inmate was directed to complete his move.
Officer Dickerson had the bag transport[ed] to the watch
commander's office so I could investigate further.
I found inmate Bowen's personal legal work, other inmate's
legal work, law books (Jailhouse Lawyers Manual with the
name "Jose" on the cover, Statsky Legal
Thesaurus/Dictionary with "Groveland Correctional/Main
Library" crossed out with the initials "D.B." in it, NYS
Homeless Veteran's Service Guide marked "Guidance Unit
Main"; State owned office supplies [] tape, paper clips, folder
labels, wire bound spiral memo book, 3 pornographic
magazines, lined [paper], photocopies of pornographic
photos from the magazine, assorted blank paper, 12" ruler
marked "Book Room - Clerk."

The VRTP Clerk's Office is a program area for the Guidance
Unit.  No personal property, especially legal work or
pornographic materials are allowed.  Further the inmate was
not authorized to remove state-owned office supplies from
any area and place them in his personal property except for
a Mead Composition Book (09910) for use as the ILC
Secretary.  Inmate Bowens is a Eve/Lt Eve Law Library
Clerk.

Dkt. #26, pp.5-6.  C.O. Dickerson endorsed the misbehavior report.  Dkt. #26, p.5.  As

part of his duties as Review Officer, defendant Irving Schoenacker received the

misbehavior report.  Dkt. #53, ¶ 8.  Initially, defendant Schoenacker determined that the

misbehavior report was complete and stated a valid charge.  *Id*.  "Then, given the

serious nature of plaintiff's alleged infractions, I determined that plaintiff should be

entitled [sic] a Superintendent's hearing and coded the misbehavior report as a Tier III."

*Id*.  Plaintiff was not confined following issuance of the misbehavior report.  Dkt. #26,

p.10.

> Sergeant Pollock informed Lt. Keller that:
>
> [o]n October 21, 2005, I again interviewed Inmate Bowens in my office.  This was a follow-up to a ticket I wrote on Inmate Bowens concerning contraband he had in the V.R.T.P. Clerk's office that was discovered by R. Dickerson, C.O., the day of his move out of G-2.  I explained the seriousness of the misbehavior report and that it would be a Tier III ticket and the possible dispositions.  I then asked Inmate Bowens about other inmate law library clerks violating the condition of their assignments as law library clerks.  Inmate Bowens denied any knowledge of any unauthorized activities in the Law Library.  Serving Officer J. Martin contacted me during the interview and asked for me to send Inmate Bowens to C-School after I was done with him, so he could serve him his ticket.
>
> Concerning the inmate's accusation on any note I allegedly authored to the Law Library officers stating that he could not work his assigned job, I do not recall writing any such note.  I asked the officer covering the Activities Building today to look for such a note, all that could be found on this date is Bowens name scratched off the roster.  I have not spoken to any of the assigned Law Library officers at all about Inmate Bowens. . . .

Dkt. #26, p.136.  As part of the investigation into plaintiff's complaints, however, C.O.

Bauman wrote:

> My only involvement in this matter is that I did work the law library on 10-21-05 and upon reporting to the law library at 3:00 p.m., I did find a note on my desk saying to not let inmate Bowens work in the law library until further notice per Sgt. Pollock.  Inmate Bowens showed up for work and I told him to leave & not show up again until further notice.

Dkt. #1-2, p.12.  C.O. Austin explained that,

> [o]n Oct. 24 . . . 2005 I reported to my bid [sic] in the law lib.
> I opened the log book and there was a note inside that
> stated inmate Bowens . . . was not allowed in the law library
> until after his hearing per Sgt. Pollock.  I explained this to
> Bowens and told him he would be handled as if he were
> [keeplock] that if he needed any legal assistance he could
> drop me a tab stating what he needed for his hearing.  He
> did not send me any tabs saying he needed help.

Dkt. #1-2, p.13.

Plaintiff appeared before the Program Committee on October 24, 2005.

Dkt. #1, ¶ 37.  Sergeant Pollock explained that this was a scheduled appearance and

that,

> [p]rior to his coming into the room, I did inform Mr. Lindsay,
> the Program Committee Chair[,] about Bowen's situation.
> As Chair, Mr. Lindsay decided that Inmate Bowens should
> be removed from the Law Library Clerk position pending his
> hearing.  This is a normal procedure, when a misbehavior
> ticket is written in an inmate's program area.

Dkt. #26, p.136.  By Memorandum dated November 14, 2005, in response to plaintiff's

complaints, S.C.C. Lindsay advised Inmate Grievance Supervisor O'Brien that plaintiff

was,

> scheduled for Program Committee on a routine basis due to
> his completion of Transitional Services Phase III.
>
> Prior to his entry into the room, the Program Sergeant
> informed me that inmate Bowens . . . had a misbehavior
> report pending.  When inmate Bowens came into the room, I
> informed him that I wanted to review the misbehavior report.
> When we checked the misbehavior report we found that the
> Tier III misbehavior report contained three charges which
> involved his Program in the Law Library, where he was
> assigned as an administrative clerk.  As program
> Chairperson I decided to remove him from the assignment
> until the misbehavior report had been resolved.  If he is
> found not guilty of those charges, he will be restored to the

> law library, including back pay.  If he is found guilty of those
> charges he will be rescheduled for Program Committee
> when the disciplinary sanctions are completed and re-
> Programmed to another assignment.

Dkt. #26, p.146.  Deputy Superintendent for Security Gerard Krempasky affirms that it

was "standard procedure" to remove an inmate from his programming pending

resolution of a disciplinary hearing where the misbehavior report involved allegations

pertaining to that programming.  Dkt. #38, ¶ 7.


The Tier III hearing commenced on November 1, 2005 before Captain

Wilcox.  Dkt. #26, p.10.  In response to plaintiff's concern that he needed an employee

assistant, Captain Wilcox advised plaintiff that he could request documents during the

course of the hearing and made arrangements for plaintiff to access the Law Library.

Dkt. #26, p.16.  Inmate assistance is not required when an inmate is not confined.  Dkt.

#42, ¶ 6.


Plaintiff explained to Captain Wilcox that he was in possession of the

*Jailhouse Lawyers Manual* because another inmate, Jose Marrero, put them on the

[Veterans Program's] office desk Wednesday morning so that he could donate them to

the Law Library.  Dkt. #26, p.25.  Inmate Marrero testified that he brought the manual

and its supplement to the office for plaintiff to drop off at the Law Library because he is

getting ready to be released and rarely leaves his dorm so as to avoid any trouble

before his release.  Dkt. #26, pp.41-42.  It was confirmed that inmate Marrero properly

received the books through legal mail.  Dkt. #26, p.58.  Captain Wilcox informed plaintiff

that inmate Marrero could not leave books with an inmate to donate, but was required

to follow a process through the Dep. of Programs. Dkt. #26, p.25. Plaintiff responded that he had tried to find the appropriate procedure for an inmate wishing to donate books to the Law Library, but found none, and noted that he had only received the book the morning he was directed to move. Dkt. #26, p.26.

Plaintiff informed Captain Wilcox that he had checked the legal thesaurus out of the Law Library and Captain Wilcox confirmed that was so. Dkt. #26, pp.30 and 73. Plaintiff also stated that the ruler was inside a folder and that he would have removed it if he had been able to go though his bag inside the office because he understood that it would be considered contraband inside the K dorm. Dkt. #26, p.44. He explained that the file folders and file folder labels were in his draft bag because he used them in both the veterans office and in the Law Library to assist veterans who were not residents of the Veterans Program Housing Unit. Dkt. #26, p.30.

C.O. Dickerson testified that he went down to the basement in the office and observed a bag half full of property which contained contraband. Dkt. #26, p.44. C.O. Dickerson locked the door and confirmed the bag was plaintiff's when he asked C.O. Dickerson to unlock the door so he could get his bag. Dkt. #26, p.45. Sergeant Pollock testified that he considered the Playboy magazines contraband because pornography is forbidden in the veteran's residential treatment program dorm, as well as in any program areas, including the veteran's inmate clerk's office. Dkt. #26, p.56. Sergeant Pollock testified that plaintiff was a Volunteer Clerk in the Veterans Program and resided in the Veterans Program Housing Unit, which would subject him to the conditions of that housing unit. Dkt. #26, p.56. Sergeant Pollock confirmed that he

believed the assorted legal papers of plaintiff and other inmates to be contraband because they were discovered in an area where they did not belong.  Dkt. #26, p.57. Sergeant Pollock explained that although the wire bound memo pads were once issued to the ILC, "a revised memo came out making them contraband."  Dkt. #26, pp.57-58.

Sergeant Pollock spoke with the Veterans Program director, Mr. Strollo, and determined that plaintiff could be moved as he had completed the program and was a volunteer clerk.  Dkt. #26, p.60.  Corrections Counselor Strollo perceived that Sergeant Pollock "was upset about what Mr. Bowens had done," but was handling the situation himself.  Dkt. #26, p.89. Corrections Counselor Strollo testified that plaintiff was part of the Veterans Program and had been hired as a clerk in the Veterans Program.  Dkt. #26, p.87.  Corrections Counselor Strollo testified that inmates residing in the Veterans Program Housing Unit, regardless of whether they were a program participant or not, were not allowed to possess magazines such as Playboy.  Dkt. #26, p.87.  Corrections Counselor Strollo also testified that plaintiff was not allowed to take personal property, including legal work, into the clerk's office.  Dkt. #26, pp.87-88.

Plaintiff conceded possession of the Playboy magazines, but testified that they were in his locker until he was directed to pack his belongings, at which time he attempted to put all his books, magazines, and papers into one bag.  Dkt. #26, p.94. Similarly, plaintiff explained that his legal materials had been in his locker and was taken to the veterans office when he was directed to pack his bags so that all his books and papers would be in the same draft bag.  Dkt. #26, pp.32-33.  Plaintiff explained that the legal materials containing other inmates' names were draft pleadings available as

reference materials in the Law Library and drafts of work he did for inmates as part of his duties as a clerk in the Law Library. Dkt. #26, pp.34-35. He conceded that he "must have grabbed too many files when he" retrieved his own possessions from the Law Library, adding that he would have returned them to their proper spot had he had a chance to go through his draft bag as he had planned. Dkt. #26, p.35. Plaintiff testified that he kept his veterans related material and books for a business course he was taking in the veterans office. Dkt. #26, p.33. He testified that the business class was sponsored by the Veterans Program and explained that he would work on the course work in the veterans office whenever he had free time, adding that he was never told he couldn't work on the business course in the Veterans Program office and assumed that he could "because it was all veteran's related stuff that I was doing." Dkt. #26, p.29. Plaintiff reiterated that the program director gave him the memo pads. Dkt. #26, pp.28-29.

Sergeant Pollock testified that he spoke with the Chair of the ILC, inmate McDuffy, about the letter and was informed that plaintiff had been instructed to speak to Sergeant Pollock, but had not been given authority to write a letter. Dkt. #26, p.64. Inmate McDuffy confirmed that he had told plaintiff to get in touch with Sergeant Pollock about the movies but never told him to write to Deputy Superintendent Bartlett. Dkt. #26, p.79. Sergeant Pollock assumed that the letter addressed to Deputy Superintendent Bartlett had been sent. Dkt. #26, pp.68 and 81. Sergeant Pollock testified that as the ILC staff advisor, he maintained an open door policy with the Chair or the Vice Chair of the ILC. Dkt. #26, p.65. Sergeant Pollock challenged the content of the letter and testified that plaintiff admitted that there was no vote by the population.

Dkt. #26, p.65. Sergeant Pollock testified that he was very disappointed by the way this issue was handled by plaintiff and that he reprimanded plaintiff because,

> this letter brings up a question of my credibility to population and that I can't work efficiently and effectively as an ILC staff advisor if my credibility is at stake. Also that I had nothing to do with the movie selection.

Dkt. #26, p.66.

Sergeant Pollock testified that plaintiff was removed from his program at the library because he had completed the program and was scheduled for a program change. Dkt. #26, p.70. Sergeant Pollock sat on plaintiff's program committee. Dkt. #26, p.69. Sergeant Pollock also testified that he conferred with Mr. Lindsay and

> advised him that this inmate had a pending tier three that may [have] something to do with this program area and Mr. Lindsay determined that pursuant to facility procedure that he be removed pending the outcome of the hearing.

Dkt. #26, p.70. Sergeant Pollock explained that if plaintiff was found not guilty, he would be programmed back with back pay. Dkt. #26, p.71. Sergeant Pollock denied leaving any instructions denying plaintiff access to the Law Library. Dkt. #26, p.71.

Captain Wilcox found plaintiff guilty of unauthorized exchange based upon plaintiff's acceptance of the Jailhouse Lawyers Manual from inmate Jose Marrero; possession of Playboy magazines in an unauthorized area; and misuse of state property based upon his use of office supplies designated for the Veterans Program in his capacity as clerk in the Law Library, but found plaintiff not guilty of possessing contraband and providing unauthorized legal assistance. Dkt. #1-2, p.39. In support of the disposition, Captain Wilcox relied upon

the written report by Sgt. Pollock . . . and his verbal
testimony at this hearing that on the date of 10/19/05 while
packing for a housing unit move, you were found to be in
possession of items allowed in general population but not
allowed in the housing unit you were in, possessed books
belonging to another inmate and were using office supplies
issued from one area of the facility in other areas.  Your
allegation that Sgt. Pollock issued the report as a form of
retaliation was not substantiated.

Dkt. #1-2, p.40.  Captain Wilcox imposed two months keeplock, with loss of

commissary and phone privileges and confiscation of plaintiff's law books, thesaurus,

homeless veterans dictionary, tape dispenser, paper clips, ruler and wire bound steno

pads.  Dkt. #1-2, p.39.  Plaintiff was immediately transferred to Livingston Correctional

Facility.  Dkt. #1-2, p.44.


## DISCUSSION AND ANALYSIS

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the

court must assess whether there are any material factual issues to be tried while

resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798

(W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## Title 42, United States Code, Section 1981

Title 42, United States Code, Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains,

penalties, taxes, licenses, and exactions of every kind, and
to no other.

To establish a claim under Title 42, United States Code, Section 1981, a plaintiff must
demonstrate that (1) the plaintiff is a member of a racial minority, (2) the defendants
intended to discriminate on the basis of race, and (3) the discrimination concerns one of
the statute's enumerated activities. *Brown v. City of Oneonta, New York*, 221 F.3d 329,
339 (2d Cir. 2000), *cert. denied*, 534 U.S 816 (2001). "Essential to an action under
Section 1981 are allegations that the defendants' acts were purposefully discriminatory
and racially motivated." *Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1988)
(internal citations omitted). Although direct evidence of discrimination is not necessary,
a plaintiff must do more than cite to his mistreatment and ask the court to conclude that
it must have been related to his race. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d
Cir. 2001).

"To support a claim of selective enforcement, [plaintiff] must allege
purposeful and systematic discrimination by specifying instances in which they were
singled . . . out for unlawful oppression in contrast to others **similarly situated**." *Brown*,
221 F.3d at 573 (internal quotation omitted). While the circumstances need not be
identical, there should be a reasonably close resemblance of facts and circumstances
where the plaintiff seeks to draw inferences of discrimination by showing that he was
similarly situated in all material respects to the individuals to whom he compares
himself. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001).

To establish retaliation, a plaintiff must show that he was (1) engaged in an activity protected under anti-discrimination statutes, (2) the defendant was aware of plaintiff's participation in the protected activity, (3) the defendant took adverse action against plaintiff based upon that activity, and (4) a causal connection existed between plaintiff's protected activity and the adverse action taken by defendant. *Id.* at 105.

As there is no evidence before the Court to suggest that plaintiff was disciplined or moved from his housing unit or removed from his prison work and volunteer assignment because of his race or because of his complaints of racial discrimination, or that similarly situated inmates of other races were treated preferentially to plaintiff, it is recommended that plaintiff's claims pursuant to 42 U.S.C. § 1981 be dismissed.

## Title 42, United States Code, Section 1983

Title 42, United States Code, Section 1983 provides "a method for vindicating federal rights elsewhere conferred, including under the Constitution.'" *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010), *cert. denied*, ___ S.Ct. ___, 2010 WL 2300385 (2010) (internal quotation omitted).

## Retaliation

Plaintiff alleges that his constitutional rights were violated in retaliation for his performance of his duties as Secretary of the ILC. Dkt. #1, ¶ 21. Specifically, plaintiff complains that he was removed from his housing unit, issued a Tier III

misbehavior report for infractions undeserving of such disciplinary procedures, removed

from his job in the Law Library, denied access to the Law Library, subjected to loss of

his personal legal work, and denied timely resolution of his grievances, all in retaliation

for writing two letters regarding the inmate movie selection.  Dkt. #1.

> A plaintiff alleging retaliatory punishment bears the burden
> of showing that the conduct at issue was constitutionally
> protected and that the protected conduct was a substantial
> or motivating factor in the prison officials' decision to
> discipline the plaintiff.  The burden then shifts to the
> defendant to show that the plaintiff would have received the
> same punishment even absent the retaliatory motivation.
> The defendant can meet this burden by demonstrating that
> there is no dispute that the plaintiff committed the most
> serious, if not all, of the prohibited conduct charged in the
> misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir. 2002) (internal quotations and citations

omitted).  "Thus, if taken for both proper and improper reasons, state action may be

upheld if the action would have been taken based on the proper reasons alone."

*Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  Moreover, the Court of Appeals

has recognized that prisoners' claims of retaliation should be examined "with skepticism

and particular care" given the "near inevitability of decisions and actions by prison

officials to which prisoners will take exception and the ease with which claims of

retaliation may be fabricated."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

### Housing Unit Transfer

To sustain a First Amendment retaliation claim, a prisoner must

demonstrate that (1) the speech or conduct at issue was protected; (2) the defendant

took adverse action against the prisoner; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

Prisoners possess a substantive right to free and uninhibited access to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. *Davis v. Goord*, 320 F.3d 352-53 (2d Cir. 2003)*; Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988). Thus, plaintiff possessed a constitutional right to raise his concerns about the inmate movie selection and inmate access to movie selections to prison authorities.

Adverse action is defined objectively as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. *Id.* Within a day of the discovery of the letters raising concerns about the inmate movie selection, Sergeant Pollock requested that plaintiff be removed from his housing unit. Dkt. #26, p.137. As a result, plaintiff alleges that he was removed from a therapeutic housing environment of 34 inmates "to one of the most incident prone dorms in the facility" housing 60 inmates and that he was "moved from a single man cube to the top bunk in a double bunk area." Dkt. #1, ¶ 53. This is sufficient to satisfy the adverse action requirement.

The causal connection may be established by the contemporaneous timing of Sergeant Pollock's discovery of the letters and his request to Captain Wilcox

that plaintiff be transferred.  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)

(Causal connection may be established by demonstrating that the protected activity was

close in time to the adverse action).  In addition, Sergeant Pollock admitted that he took

the memos "very seriously because it was a breach of protocol and additionally placed

my creditability [sic] with the Inmate population at risk."  Dkt. #26, p.137.  Moreover, the

Veterans Program Director, Corrections Counselor Strollo, testified at plaintiff's

disciplinary hearing that Sergeant Pollock showed him the letters and  "was upset about

what [plaintiff] had done."  Dkt. #26, pp.68 and 88-89.


Whether plaintiff would have been transferred out of the housing unit

absent Sergeant Pollock's distress over the letters authored by plaintiff is a question of

fact which must be resolved by a jury, particularly in light of plaintiff's allegation that he

understood that he would be afforded the option of dropping his higher paying position

as a Paralegal in the Law Library should it become necessary for him to be paid as a

Clerk in order to remain in the Veterans Program Housing Unit.  Dkt. #1, ¶ 24.  Thus, it

is recommended that Sergeant Pollock's motion for summary judgment be denied with

respect to plaintiff's claim of retaliatory transfer from the Veterans Program Housing

Unit.


### Misbehavior Report

Although "a prison inmate has no general constitutional right to be free

from being falsely accused in a misbehavior report," the issuance of a false misbehavior

report in retaliation for exercising a constitutional right is actionable under Title 42,

United States Code, Section 1983. *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *see Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

For the same reasons set forth above with respect to the housing transfer, plaintiff has demonstrated that the letters raising concerns regarding inmate movie selection were protected activity. In addition to subjecting plaintiff to the prospect of discipline, the issuance of the misbehavior report by Sergeant Pollock caused plaintiff to be removed from his work assignment at the Law Library pending resolution of the disciplinary proceeding and excluded from the Law Library generally for the period between the issuance of the misbehavior report and the start of the disciplinary hearing, thereby satisfying the adverse action requirement.

As set forth above, the issuance of the misbehavior report authored by Sergeant Pollock within one day of his discovery of the letters raising concerns over the movie selection and Sergeant Pollock's admission that he took the memos "very seriously" and Corrections Counselor Strollo's testimony that Sergeant Pollock "was upset about what [plaintiff] had done" is evidence of causal connection. Dkt. #26, pp.68, 88-89 and 137. In addition, Captain Wilcox commented at the hearing that plaintiff had not had a disciplinary ticket in five years. *See Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995) (evidence of prior good behavior may be circumstantial

evidence of retaliation). Finally, although plaintiff conceded possession of a book owned by another inmate and pornography in a housing unit where pornography was prohibited, as well as using state property issued for use in the Veterans Program in the Law Library instead, he was cleared of more serious charges of providing unauthorized legal assistance and possession of unauthorized articles. *See Gayle*, 313 F.3d at 683 ("vindication of the inmate after a hearing may constitute circumstantial evidence of a defendant's retaliatory motive.").

Although plaintiff conceded possession of a book owned by another inmate and pornography in a housing unit where pornography was prohibited, as well as using state property issued for use in the Veterans Program in the Law Library instead, the Court finds a question of fact as to whether plaintiff would have been subjected to a misbehavior report for these infractions absent Sergeant Pollock's unhappiness over plaintiff's perceived breach of protocol in writing letters of concern regarding the inmate movie selection. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be denied.

**Determination of Appropriate Disciplinary Tier**

Lieutenant Schoenacker's determination that the charges set forth in the misbehavior report were sufficiently serious as to warrant a Superintendent's hearing is not actionable. Even accepting for purposes of this motion that Sergeant Pollock authored the misbehavior report in retaliation for plaintiff's letters, there is no evidence that Lieutenant Schoenacker was aware of that fact or had any communication with

Sergeant Pollock which would support the inference of conspiracy. Accordingly, it is recommend that this aspect of defendants' motion for summary judgment be granted.

### Removal from Law Library Job

New York law does not give a prisoner any statutory, regulatory or precedential right to a prison job. *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987). However, a claim for relief may be stated pursuant to Title 42, United States Code, Section 1983 "if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights" such as the right to petition government for the redress of grievances. *Id.* Thus, plaintiff could not be removed from his work assignment in retaliation for his exercise of his right to question the selection of inmate movies.

The record reveals that the decision to remove plaintiff from his position within the Law Library was made by Senior Corrections Counselor Lindsay after Sergeant Pollock informed him of the pending misbehavior report. Dkt. #26, pp.137 and 146. Moreover, the record is uncontroverted that it was standard procedure to remove an inmate from his program pending resolution of disciplinary proceedings relating to an inmate's program. Dkt. #26, pp.137 and 146; Dkt. #38, ¶ 7. There is no evidence to suggest that S.C.C. Lindsay was motivated by, or was even aware of, plaintiff's complaints regarding the inmate movie selection when he determined that plaintiff should be removed from his position in the Law Library until the disciplinary proceeding was resolved and no suggestion of any agreement between Sergeant

Pollock and S.C.C. Lindsay to retaliate against plaintiff for the exercise of his right to complain about the inmate movie selection. *See Dawes,* 239 F.3d at 492 (allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action); *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857 (1983) *(*"Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983."). Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

### Timely Resolution of Grievances

Plaintiff alleges that the grievances he filed following the issuance of the misbehavior report were not resolved in a timely fashion and were not resolved in the order in which his grievances were received. Dkt. #1, ¶ 73. As a result, plaintiff complains that he was denied evidence for use in his disciplinary hearing. Dkt. #1, ¶ 75.

The grievance process is not an appropriate vehicle for gathering evidence for use in a disciplinary proceeding. Moreover, as the Inmate Grievance Supervisor Bonnie O'Brien declares, there is no requirement or expectation that grievances will be handled in the order in which they are received, as some grievances require more time to investigate and resolve than others. Dkt. #40, ¶ 9. In any event, plaintiff's grievances were resolved within three weeks of the filing of the first grievance and were dismissed, negating any suggestion that an earlier resolution would have

supported his arguments at the disciplinary hearing. There is no evidence to suggest any agreement between Sergeant Pollock and the inmate grievance committee to deny his grievances in retaliation for plaintiff's letters regarding the inmate movie selection. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Access to the Courts**

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977), *accord Lewis v. Casey*, 518 U.S. 343, 350 (1996). "The right of access to the courts requires that prisoners defending against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement . . . not be impeded from presenting those defenses and claims for formal adjudication by a court." *Bourdon v. Loughren*, 386 F.3d 88, 96 (2d Cir. 2004). Inmate access to the court must be "adequate, effective, and meaningful." *Bounds*, 430 U.S. at 822. To establish a violation of this right, an inmate must demonstrate "actual injury" by showing "that a non-frivolous legal claim had been frustrated or was being impeded" because of the inadequate access. *Lewis*, 518 U.S. at 353 (footnotes omitted).

Although the Court finds a question of fact as to whether Sergeant Pollock denied plaintiff access to the Law Library in retaliation for the letters concerning the inmate movie selection, this claim fails for lack of evidence of actual injury. Accordingly,

it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Due Process Claim**

To state a cognizable section 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996); *Frazier v. Coughlin*, 81 F.3d 313, 316 (2d Cir. 1996).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004), *quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id., quoting Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more

severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 64-65. As a result, district courts are "required to examine the conditions of confinement in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (internal quotations omitted). The district courts are "required to examine the actual circumstances of confinement and to identify with specificity the facts upon which their conclusions are based." *Id.* at 134 (internal quotations omitted). A detailed factual record is required unless the period of time spent in SHU was exceedingly short – less than 30 days – and there is no indication that the plaintiff endured unusual SHU conditions. *Id.* at 135. "Only when the conditions are uncontested may a district court resolve the issue of atypicality of confinement as a matter of law." *Id.* at 134.

As defendants have presented no evidence regarding typical conditions of keeplock confinement as compared to the general population and the actual conditions of plaintiff's keeplock confinement, the Court lacks a sufficient factual record upon which to assess whether plaintiff has demonstrated a liberty interest with respect to his keeplock confinement of two months. Accordingly, it is recommended that defendants' motion be denied on this ground.

**Sufficiency of Process**

### Impartiality of Hearing Officer

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996); *see Wolff v. McDonnell*, 418 U.S. 539, 570-71 (1974); *Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir.1990); *see Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259; *see Francis*, 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis*, 891 F.2d at 46.

Plaintiff complains that Captain Wilcox refused to recuse himself from conducting the hearing, denied plaintiff's request for an employee assistant, denied plaintiff's request for documents and was predisposed to a finding of guilt. Dkt. #1.

Contrary to plaintiff's allegations, the record establishes that Captain Wilcox conducted an impartial hearing. The evidence in the administrative record (hearing transcript) establishes that plaintiff's acceptance of a book from another inmate and thereafter, maintaining possession of that book after it could not be donated to the law library even though the other inmate was still at Groveland, was a clear violation of Sub Section 113.15 of the Standards of Inmate Behavior. Dkt. #42, ¶ 14. In addition, the evidence clearly established that plaintiff was not allowed to possess the Playboy magazine in the dorm where he was housed pursuant to the Veteran's Residential Therapeutic Program Conduct Guide Sub Section Housing Unit K and therefore, was in violation of Sub Section 113.22, property in an unauthorized area. *Id*. Lastly, the evidence clearly supported the finding of plaintiff guilty of Sub Section 116.10, theft of state property. *Id*.

Plaintiff was found not guilty of the charges of contraband and unauthorized legal assistance, as Captain Wilcox found that there was not enough evidence available to show his culpability for these charges. *Id*. As discussed below, Captain Wilcox's disposition was supported by evidence in the form of the misbehavior report, as well as the testimony of defendant Pollack, inmate McDuffy and Mr. Strollo. It is clear from the record that Captain Wilcox was impartial and unbiased in the conduct of the Tier III disciplinary hearing and clearly evaluated all of the evidence presented during the hearing, as demonstrated by the fact that he found plaintiff not guilty of several of the charges. Therefore, it is recommended that this portion of defendants' motion for summary judgment be granted.

## Sufficiency of the Evidence

Regardless of plaintiff's explanation for why he was in possession of inmate Marrero's Jail House Lawyer's Manual, there is no dispute that inmate Marrero transferred possession of this book to plaintiff. Dkt. #26, pp.25-26, 41-42, 58. Thus, the evidence was sufficient to find plaintiff guilty of unauthorized exchange of personal property. Similarly, plaintiff does not dispute that he possessed pornographic magazines within the confines of the Veterans Program Housing Unit, in violation of the Veterans Program Conduct Guide. Dkt. #1-3, p.20. Finally, the evidence is sufficient to support a finding that plaintiff was using office supplies issued to the Veterans Program in the Law Library, as plaintiff testified at his disciplinary hearing that he used the supplies in the Veterans Office and in the Law Library to assist veterans who were not residents of the Veterans Program Housing Unit. Accordingly, it is recommended that this aspect of defendants' motion be granted.

## Employee Assistant and Request for Documents

Plaintiff also complains that Captain Wilcox denied plaintiff's request for an employee assistant and denied plaintiff's requests for two unspecified documents to be used as evidence during the disciplinary hearing. Plaintiff requested an employee assistant to aid in the retrieval of two documents to support his defense. Captain Wilcox denied plaintiff's request pursuant to DOCS Directive 4932 Sub Section 251.4,1, because plaintiff was not confined in segregated confinement while awaiting the Tier III disciplinary hearing and could have obtained the documents himself. Dkt. #42, ¶ 6. An inmate's right to an employee assistant while being confined has been well established.

*Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  However, the right to an employee assistant does not extend to an inmate who is able to conduct his own investigative work.  *Hameed v. Mann*, 57 F.3d 217 (2d Cir. 1995).

Insofar as plaintiff claims that he was denied access to certain unspecified documents, as noted above, plaintiff was in a position to conduct his own investigative work.  With respect to the two documents specifically discussed during the disciplinary hearing, one was a copy of the housing unit change form plaintiff thought was used when he was moved from G-2 form to K-1 dorm.  However, because Captain Wilcox oversaw all movement within the facility and further, authorized all moves, Captain Wilcox explained that he did not use any move forms and thus, the document requested by plaintiff simply did not exist.  The second document requested by plaintiff was a form to the law library program recommending that plaintiff be removed from his program assignment.  During the hearing, plaintiff was given ample opportunity to produce the document.  Moreover, once plaintiff was advised that he needed to obtain the document on his own, he never formally requested the document from Captain Wilcox.  Notwithstanding the foregoing, Captain Wilcox determined that such document would be cumulative and duplicative because other evidence was presented during the hearing concerning plaintiff's removal from the law library program.  For the foregoing reasons, the alleged denial of the employee assistant and failure to provide plaintiff with the requested documents does not constitute a denial of due process in the conduct of the Tier III disciplinary hearing.  For the foregoing reasons, it is recommended that this portion of defendants' motion for summary judgment be granted.

**Equal Protection**

"The equal protection clause directs state actors to treat similarly situated people alike." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1985), *citing Cleburn v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class." *Id.* Alternatively, plaintiff may proceed on a "class of one" theory, in which case "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds*, *Appel v. Spiridon*, 531 F.3d 138 (2d. Cir. 2008). Thus, in a "class of one" case, a plaintiff must establish that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.*

Plaintiff cannot sustain a claim that Captain Wilcox denied him due process of law in finding plaintiff, but not inmate Marrero, guilty of unauthorized exchange because inmate Marrero was not subject to a misbehavior report and therefore, not before him for a disciplinary hearing. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Personal Involvement**

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060,1065 (2d Cir. 1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon*, 58 F.3d at 873, *citing Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

Defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay all claim that they lack the requisite personal involvement and therefore, plaintiff's claims against each of them should dismissed. In his complaint, plaintiff alleges that defendants Hunt, Kruppner, Krempasky and Bartlett each had personal knowledge that defendant Pollack issued a deprivation order and further that defendants Pollack and Lindsay conspired in retaliatory removal of plaintiff from his job in the law library, but did nothing. Dkt. #1, ¶¶ 107-115. Plaintiff further claims that these defendants had knowledge that defendant O'Brien had obstructed and hindered plaintiff's grievances from going forward. *Id*. at ¶ 16. Moreover, plaintiff claims that defendant Hunt was

responsible for appointing defendant Wilcox to serve as the hearing officer, notwithstanding the fact that he knew of defendant Wilcox's personal involvement in the removal of plaintiff from the Veterans Residential Treatment Program and the dorm. *Id*. at ¶ 114.

There is nothing in the record before this Court to support a conclusion that Superintendent Hunt, Deputy Superintendents Kruppner, Krempasky and Bartlett and Lieutenants Keller and Kelsay were more involved than simply by virtue of the fact that they held supervisory positions within the prison chain of command. The fact that Superintendent Hunt issued two memos in response to plaintiff's claims of retaliation does not alter the analysis of whether he was sufficiently personally involved thereby requiring denial of his motion for summary judgment. Similarly, defendant Krempasky's review of the investigation which concluded that no wrongdoing had occurred does not require a finding that he was sufficiently personally involved. Both Lieutenant Keller's and Lieutenant Kelsay's involvement was limited to conducting the subject investigation. Dkt. ##36 and 37. Finally, defendants Bartlett and Kruppner neither participated in the investigation nor knew plaintiff. Dkt. ##34 and 39. Accordingly, because defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay were not sufficiently personally involved in the alleged constitutional deprivations, it is recommended that plaintiff's claims against each of them fail as a matter of law.

**Conspiracy - Title 42, United States Code, Section 1983**

"To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds that violated the plaintiff's rights, privileges, or immunities secured by the Constitution or federal courts." *Duff v. Coughlin*, 794 F. Supp. 521, 525 (S.D.N.Y. 1992) (internal quotation omitted). "To establish that a conspiracy existed plaintiff must demonstrate the defendants 'agreed' or 'reached an understanding' to violate his rights." *Id.* "Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857 (1983). As plaintiff does not allege and the record does not reflect any agreement among the defendants, summary judgment is appropriate with respect to plaintiff's vague allegations of conspiracy. For the foregoing reasons, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim be granted.

**Conspiracy - Title 42, United States Code, Section 1985(3)**

42 U.S.C. § 1985(3) provides:

If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . if one or more persons . . . do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is . . . deprived of having and exercising any right or privilege of a citizen of the United states, the party so injured or deprived may have an action for the recovery of damages.

"The conspiracy must be motivated by racial or related class-based discriminatory animus." *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996). Other than plaintiff's speculative and conclusory allegations that defendants conspired to retaliate against the plaintiff in racially motivated ways, the complaint is devoid of any allegations of invidious discriminatory animous on the part of the defendants. Conclusory allegations are wholly insufficient to state a claim pursuant to section 1985(3). Accordingly, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1985(3) be granted.

**Conspiracy - Title 42, United States Code, Section 1986**

Title 42, United States Code, Section 1986 imposes liability on an individual who has knowledge of discrimination prohibited under Title 42, United States Code, Section 1985. *Graham*, 89 F.3d at 82. Thus, a section 1986 claim is contingent upon a valid section 1985 claim. *Id.* Because plaintiff fails to establish a cause of action pursuant to Title 42, United States Code, Section 1985, his claim pursuant to Title 42, United States Code, Section 1986 must also be dismissed. For the foregoing reasons, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1986 be granted.

## CONCLUSION

For the foregoing reasons, this Court recommends that:

1. Defendants' motion for summary judgment on plaintiff's claim pursuant to Title 42, United States Code, Section 1981 be granted;

2.  Defendants' motion for summary judgment on plaintiff's retaliation claim (Housing Unit Transfer) be denied;

3.  Defendants' motion for summary judgment on plaintiff's retaliation claim (Misbehavior Report) be denied;

4.  Defendants' motion for summary judgment on plaintiff's retaliation claim (Determination of Appropriate Disciplinary Tier) be granted;

5.  Defendants' motion for summary judgment on plaintiff's retaliation claim (Removal from Law Library Job) be granted;

6.  Defendant's motion for summary judgment on plaintiff's retaliation claim (Timely Resolution of Grievances) be granted;

7.  Defendants' motion for summary judgment on plaintiff's access to the courts claim be granted;

8.  Defendants' motion for summary judgment on plaintiff's due process claim be denied;

9.  Defendants' motion for summary judgment on plaintiff's sufficiency of due process (disciplinary hearing) be granted;

10.  Defendants' motion for summary judgment on plaintiff's equal protection claim be granted;

11.  Defendants' motion for summary judgment based on lack of personal involvement of defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay be granted;

12.  Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1983 be granted;

13.  Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1985(3) be granted;

14.  Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1986 be granted; and

15.  Plaintiff's motion for summary judgment be denied in all respects.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*,

474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

     **SO ORDERED.**

DATED:     Buffalo, New York
           October 12, 2010

                     *s/ H. Kenneth Schroeder, Jr.*
                     **H. KENNETH SCHROEDER, JR.**
                     **United States Magistrate Judge**